Filed 12/8/21  In re N.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re N.R. et al., Persons Coming Under the Juvenile Court Law. | C093954 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>T.R.,<br><br>    Defendant and Appellant. | (Super. Ct. Nos.<br>JV-2021-18-1, JV-2021-18-2) |

T.R., mother of the minors, N.R. and S.M., appeals from the juvenile court's orders asserting jurisdiction over the minors and removing them from mother's custody. (Welf. & Inst. Code, §§ 300, subd. (b), 361, subd. (c)(1) & (6).)[1]  Mother contends: (1) the juvenile court lacked substantial evidence to sustain the jurisdictional findings under section 300, subdivision (b)(1); (2) the juvenile court did not have substantial

---

[1]      Undesignated statutory references are to the Welfare and Institutions Code.

1

evidence to order removal from mother at disposition; and (3) the juvenile court erred in failing to consider alternatives to removal. We will affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

On December 8, 2020, the Yolo County Health and Human Services Agency (Agency) received a referral regarding domestic violence and substance abuse in the home. It was reported that mother found her boyfriend, J.P., smoking methamphetamine in the garage and told him to leave. While the children were present, there was a physical confrontation and J.P. grabbed mother's wrists, leaving a scratch on one and a mark on the other. J.P. then began to throw items, including a chair. The investigating social worker attempted to contact mother 10 times between December 17, 2020, and January 19, 2021. On January 20, 2021, the social worker was able to contact mother at home. Mother stated she did not want contact with the Agency and refused entry into the home. Mother denied seeing J.P. using any sort of drug but said that they had a verbal dispute. She denied the children were present and denied any domestic violence. Mother reported that she was no longer in a relationship with J.P. and he had not been in the home since the December 8, 2020 incident, but said she did have contact with him at the hospital when her baby was born because he was the father. J.P. was interviewed, and he denied drug use. He further stated that he and mother were still in a relationship and that he resides at the home with mother.

On January 25, 2021, the Agency received a report that mother's new baby had died while in the care of mother and J.P. Mother and J.P. admitted to co-sleeping with the baby in the bed with them, and preliminary findings indicated that positional asphyxiation was the cause of death. Mother denied drug use by herself or J.P., denied domestic violence, and stated that they were not in a relationship but that J.P. came by the home at times to visit with the baby. The maternal grandfather denied seeing any marks or bruises on mother, but the grandmother reported seeing a handprint bruise on mother's bicep a few months prior. The children were interviewed, and they told the social worker

2

that J.P. had been in the home, but he was not always there. S.M. stated that he did not like it when J.P. became angry because he would yell at mother and throw things, including multiple chairs, breaking them. S.M. stated that he would yell at mother and J.P. to stop, but that did not usually work, so sometimes he and his brother would hide under blankets.

The maternal grandmother agreed to keep the children at her home during the investigation. On January 26, 2021, the grandmother contacted the agency and reported that she was very concerned because mother's friend who had been staying with her had left the home due to mother actively using methamphetamine. The social worker made attempts to contact mother, who declined contact with the Agency. The Agency scheduled a child and family team (CFT) meeting for January 28, 2021. Mother said this was "unwanted" and illegal contact, but both maternal grandparents agreed to be present. Mother subsequently contacted the social worker and stated she would no longer be having contact with the Agency and that they could contact her tribal representative, Ashlee May. The social worker contacted Ms. May, who stated that mother was willing to drug test and it would be scheduled for the following week. On February 1, 2021, the tribal representative stated mother and J.P. were ready to test. When the social worker scheduled the drug tests, there was no response from either mother or J.P. Another drug test was scheduled, but mother did not respond to attempts to contact her by both the social worker and the tribal representative.

On February 3, 2021, the Agency obtained a protective custody warrant, and the children were removed from the care of the parents. The Agency filed petitions regarding the minors on February 5, 2021, alleging that the minors were at risk under section 300, subdivision (b)(1) due to mother's substance abuse and her failure to protect the children from domestic violence and J.P.'s substance abuse.

On February 8, 2021, the juvenile court held a detention hearing, and the minors were detained. The tribal representative of the Citizen Potawatomi Nation stated that the

3

tribe wanted the children placed with the maternal grandfather, who was the tribal member. At the detention hearing, mother's counsel argued against detention and stated she was "absolutely willing to drug test for the Agency" and that J.P. was no longer in the home. The court ordered supervised visitation for mother.

The Agency filed a combined jurisdiction and disposition report for the hearing on March 15, 2021. The representative of the Citizen Potawatomi Nation agreed with the Agency recommendation to take jurisdiction, was consulted for case planning, and was present at the CFT meeting.

The Agency reported mother was asked to drug test on February 18, 24, and 26, 2021, and March 2 and 9, 2021, but she failed to show up for any of the drug tests and had not drug tested as previously agreed.[2] On March 1, 2021, mother told the social worker she was unable to make it to the testing site but that she had tested on her own at another facility; she agreed to provide proof of the test but failed to do so. Mother subsequently provided negative test results from this facility, but the social worker could not verify the results, as mother had not signed a release of information and the tests were not observed, as had been required.

On March 1, 2021, mother reported to the social worker that she was no longer in a relationship with J.P. When the social worker met with the minors on March 5, 2021, they reported that mother had indicated to them that she was still speaking to J.P. and

---

[2]     Mother had used methamphetamine since she was 16 years old and at one point was using daily. She received voluntary family maintenance services from November 2012 to July 2013 after she used methamphetamine while pregnant with N.R. and he was born positive for amphetamines. Mother also used methamphetamine while pregnant with S.M. and following his birth. On or about July 1, 2014, both minors were placed into protective custody due to neglect and substance abuse by the parents. The family received reunification services from July 28, 2014, to April 14, 2015, and family maintenance services from April 14, 2015, to October 10, 2015, when the case was closed.

gave them a toy that she said was from J.P. N.R. reported J.P. was not at the home when they visit but he returns when they leave.

The Agency reported mother completed a substance abuse assessment over the phone and was referred for outpatient treatment at CommuniCare Health Center (CommuniCare). Mother expressed a preference to attend treatment at the Sacramento Native American Health Center, but they did not have an opening for two weeks. The court had previously ordered that mother was to have three hours of visits per week supervised by the Agency but she would not respond to the attempts by the Agency's visitation staff to contact her to schedule visits. The tribal representative reported that mother had been uncooperative with their requests as well, and they supported the children remaining in out of home placement.

A contested jurisdiction and disposition hearing took place on March 15, 2021. The representative of the Citizen Potawatomi Nation, Tracy Humphrey, testified as a qualified expert witness under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (the ICWA). She assessed the family and testified that the children would be harmed if they were returned to the parents at this time and the tribe supported the children remaining placed out of the home. Mother submitted several exhibits indicating that she signed up for various treatment services and had her locks changed, but offered no witnesses or testimony. In closing argument, mother's counsel did not dispute mother's history with child welfare but asked the court to strike allegation b-1 on the petition regarding mother's possible drug use and continuing a relationship with someone who was using drugs. Mother's counsel further asked the court to strike the last two sentences of allegation b-2 because mother claimed she was no longer in a relationship with J.P. Mother argued against removal, stating there was not clear and convincing evidence of substantial danger, that the family has a lot of support, and that she has the support of her tribe, stable housing, and employment. Minors' counsel argued that mother's failure to engage with the Agency demonstrates that she would not follow court orders or comply

5

with a case plan if the court returned the children to her care. Counsel for the Agency outlined the evidence that mother remained in contact with J.P. and was in a relationship with him, that mother continued to avoid drug testing for the Agency, and that she had completed a substance abuse assessment through CommuniCare and was referred to outpatient treatment, indicating a problem with substance abuse.

At the conclusion of the contested hearing, the juvenile court stated it was very concerned that mother did not drug test for the Agency and went out on her own to drug test, did not sign a release, and it appeared that the drug tests she submitted were not observed tests. The court found that under those circumstances, mother's negative tests were meaningless and made her suspect mother was using. The court found that the Agency met their burden with respect to jurisdiction because it was clear that mother was in some sort of continued relationship with J.P., and the court stated: "It is scary to me that these kids have to hide from this man, and she has done nothing about it." The court found, by a preponderance of evidence, that the allegations in the petition were true and took jurisdiction over the minors. The court went on to find by clear and convincing evidence that continued physical custody by mother was likely to cause serious emotional or physical harm to the children, there were no reasonable means to protect them without removing them from her, and that active efforts were made to prevent the breakup of the Indian family. The court then ordered that all of mother's drug testing must be done at CommuniCare. The court further ordered that a portion of mother's visits were to be supervised by the Agency and the Agency could only increase her visits once they had been able to supervise some of her visits.

Mother filed a notice of appeal.

6

DISCUSSION

I

*Sufficient Evidence to Support Jurisdictional Findings*

Mother contends the juvenile court did not have substantial evidence to support the finding under section 300, subdivision (b)(1) that the children suffered, or were at substantial risk of suffering, serious physical harm or illness because of any current substance abuse by mother or reoccurring domestic violence between mother and J.P. We disagree.

"[B]efore courts may exercise jurisdiction under section 300, subdivision (b) there must be evidence 'indicating the [minor] is exposed to a substantial risk of serious physical harm or illness.' " (*In re Janet T.* (2001) 93 Cal.App.4th 377, 388, fn. omitted, quoting *In re Rocco M.* (1991) 1 Cal.App.4th 814, 823, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 624, 629.) That is, section 300, subdivision (b)(1) requires evidence of three elements: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M., supra*, at p. 820; *In re R.T., supra*, at p. 624 [concluding first clause of section 300, subdivision (b)(1) "authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child"].) "The purpose of section 300 is to protect children from parental acts or omissions that place them at a substantial risk of suffering serious physical harm or illness. (§§ 300, subd. (b), 300.2.) Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection. [Citation.] The California Supreme Court has observed that, depending upon the circumstances, a 'past failure [can be] predictive of the future.' [Citation.]" (*In re A.F.* (2016) 3 Cal.App.5th 283, 289.)

We review a juvenile court's jurisdictional and dispositional findings for substantial evidence. (*In re D.C.* (2015) 243 Cal.App.4th 41, 51, superseded by statute on other grounds as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322.) "Issues of fact and credibility are questions for the trial court and not the reviewing court. The power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact." (*In re Christina T.* (1986) 184 Cal.App.3d 630, 639.)

Here, the petition alleged as part of the section 300, subdivision (b) allegations that the minors had suffered, or were at substantial risk of suffering, serious physical harm or illness due to mother's long history of substance abuse, her failure to drug test, her failure to protect the children from domestic violence in the home, and her continued relationship with J.P., despite his substance abuse and domestic violence. There is ample evidence to support those allegations.

Mother has a long-standing and serious problem with methamphetamine abuse dating back to when she was 16 years old, including during her pregnancies with both minors. Her substance abuse resulted in two prior child welfare cases and the children's previous removal from her care. The grandmother contacted the Agency and reported that she was very concerned because mother's friend who had been staying with her had left the home due to mother actively using methamphetamine. And while she was not court-ordered to drug test, she repeatedly agreed to comply with the Agency's and the tribe's requests, but evaded supervised drug testing. Despite agreeing to multiple appointments to drug test, mother instead provided negative test results from another facility, but the social worker could not verify the results as mother had not signed a release of information and the tests were not observed as she had been asked to do. Mother completed a substance abuse assessment through CommuniCare and was referred to outpatient treatment, indicating a problem with substance abuse. Further, the reported domestic violence incident involved J.P. smoking methamphetamine in the garage while

8

the children were home. Cumulatively, this was sufficient evidence to support the juvenile court's findings.

There also was sufficient evidence to support the court's findings that mother had continued a relationship with J.P. According to the children's reports to the social worker, even after the minors were detained from her, mother had indicated to them that she was still speaking to J.P. and gave them a toy that she said was from J.P. Further, she misrepresented her relationship with J.P. to the Agency. On January 20, 2021, mother reported that she was no longer in a relationship with J.P., and he had not been in the home since the domestic violence incident on December 8, 2020. However, on January 20, 2021, J.P. stated that they were still in a relationship and that he was still residing in, and sleeping at, the home with mother. This was confirmed when both mother and J.P. admitted they were sleeping in the same bed the night their infant died. There was no indication that J.P. had stopped using methamphetamine or that he had sought substance abuse treatment since the domestic violence incident, and yet mother continued to allow him to stay in the home and place her children at risk. The children repeatedly indicated they were afraid of J.P. and hid from him, which the juvenile court properly considered in evaluating whether there was a substantial risk of harm. Mother did not testify at the hearing or present any evidence to rebut this evidence except a receipt showing she changed her locks, which does not necessarily imply she was no longer in a relationship with J.P.

Here, the children have suffered by being exposed to domestic violence, and the juvenile court should not have to wait until the children are seriously abused or injured to assume jurisdiction and take steps to protect the children. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) Additionally, mother's history of substance abuse and lack of cooperation with the Agency was appropriately considered by the juvenile court in determining that the children needed the court's protection. (*Ibid.*) Here, mother's past conduct indicates sufficient reason to believe her conduct would reoccur, particularly in

light of her unwillingness to drug test, her dishonesty about her relationship with J.P., and her refusal to cooperate with the Agency or her own tribe.

For the foregoing reasons, we conclude there was substantial evidence to support each of the elements for assumption of jurisdiction under section 300, subdivision (b)(1).

II

*Substantial Evidence to Support Removal of Minors*

Mother also contends there was insufficient evidence to support the juvenile court's dispositional order removing the minors from her custody under section 361, subdivision (c). We again disagree.

Under section 361, subdivision (c)(1), a dependent child may not be taken from the physical custody of the parents with whom the child resides at the time the petition was initiated unless the juvenile court finds by clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.]" (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)

In an ICWA case, the court also needs to find by clear and convincing evidence, including testimony of a qualified expert witness, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. (§ 361, subd. (c)(6); *In re A.L.* (2015) 243 Cal.App.4th 628, 645.) "The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. [Citation.] The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child. [Citations.] In this regard, the court may consider the

10

parent's past conduct as well as present circumstances. [Citation.]" (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) When the ICWA applies, the court's findings are reviewed for supporting evidence which is " 'reasonable, credible and of solid value.' " (*In re Barbara R.* (2006) 137 Cal.App.4th 941, 950.) The record is reviewed in a light most favorable to the prevailing party and the trial court's findings shall be upheld unless no rational factfinder could reach the same conclusion. (*Ibid.*)

We conclude there is substantial evidence in the record to support the juvenile court's removal order. As a preliminary matter, the ICWA requirements were satisfied in this case because a qualified Indian expert provided testimony supporting both the active efforts finding and removal of the children. As previously discussed in part I of this opinion, there was substantial evidence demonstrating mother's substance abuse issues and relationship with J.P. prevented her from providing proper care and supervision to the minors, placing them at substantial risk of suffering physical and emotional harm. Mother's history of methamphetamine abuse, failure to drug test, failure to avail herself of opportunities to address substance abuse issues, and her continued relationship with J.P., despite his methamphetamine use and domestic violence, supported the court's conclusion that the children would be at substantial risk of danger and that the continued custody of the children by mother would be likely to result in serious emotional or physical damage to the children.

The other factors cited by mother regarding her housing, employment, and tribal support do not outweigh the substantial risk posed in the case from substance abuse and domestic violence. She failed to protect her children from witnessing the 2020 domestic violence incident despite her housing and employment. Similarly, the support of the tribe does little to mitigate the risk to the children when mother failed to cooperate with the tribal representatives on drug testing. The tribal representative that provided the expert testimony under the ICWA believed that the children would be in danger of physical or emotional harm if returned to mother. Further, given mother's failure to cooperate with

11

the Agency's efforts to assist her with substance abuse and getting appropriate care, it is not clear that the provision of services would allow the children to safely return to mother at this juncture.

For the foregoing reasons, we conclude that there was substantial evidence to support the finding that the children were at substantial risk and that continued custody was likely to cause the children serious emotional or physical damage. (§ 361, subd. (c)(1) & (6).) Accordingly, the juvenile court did not err in removing the minors from mother's custody.

III

*Reasonable Alternatives to Removal*

Mother contends the juvenile court did not address reasonable alternatives to removal. We disagree.

As we have discussed, a dependent child may not be removed unless "there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The right to the care and custody of one's child is a fundamental right protected by constitution and statute. (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.) The law requires that a child remain in parental custody unless the court is clearly convinced that such a disposition would harm the child. (*Ibid.*)

Courts have recognized that less drastic alternatives to removal may be available in a given case, including returning a minor to parental custody under stringent conditions of supervision by a human services agency, such as unannounced visits. (*In re Henry V., supra*, 119 Cal.App.4th at p. 529; *In re Jeannette S.* (1979) 94 Cal.App.3d 52, 60.)

In this case, for the reasons we have discussed, the court had sufficient evidence to support its finding that there were no reasonable means that could protect the minors without removing them from the home. The Agency already had made extensive efforts to try to work with mother without having to remove the children. The Agency first

attempted a safety plan without removing the children by having the children remain at the grandmother's home while trying to verify if mother was clean and sober. The Agency scheduled a CFT meeting and tried to assess options short of removal, but mother declined to participate. Even after the children were removed, mother refused to drug test, refused to talk to the social workers, and refused to attend the CFT meeting. The tribe reported a similar lack of cooperation. Mother did not testify at the contested jurisdiction and disposition hearing to explain her behavior or assure the court that she would cooperate with the Agency. In the absence of any level of cooperation by mother, it was not possible to return the children to mother's care with a safety plan. Mother suggests close supervision would be an adequate safeguard. However, the level of supervision necessary would not be a reasonable alternative to removal given mother's pattern of destructive behavior, involvement in substance abuse, and lack of understanding of the risks to the minors posed by those behaviors.

We conclude substantial evidence supports both the juvenile court's order removing the minors from the home and the court's finding that there were no other reasonable alternatives to protect the minors.

### DISPOSITION

The orders of the juvenile court are affirmed.


        KRAUSE        , J.


We concur:


        MURRAY        , Acting P. J.


        HOCH        , J.